UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TAHOE TAVERN PROPERTY OWNERS
ASSOCIATION; and TAVERN SHORES
OWNERS ASSOCIATION,

                               NO. CIV. S-06-407 LKK/GGH

       Plaintiffs,

    v.                            O R D E R

UNITED STATES FOREST SERVICE;
FEDERAL TRANSIT ADMINISTRATION;
and COUNTY OF PLACER, CALIFORNIA,

       Defendants.

_____/

Plaintiffs challenge a proposed transportation project over a parcel of land located near Lake Tahoe. Plaintiffs maintain that the project violates the Department of Transportation Act because it uses public recreational lands, and that defendants violated either the National Environmental Policy Act ("NEPA") or the California Environmental Quality Act ("CEQA"). Pending before the court are cross-motions for summary judgment. The court resolves the matter on the parties' papers and after oral argument. For the reasons set forth below, the court concludes that defendants

1

1  violated NEPA, but that an injunction to remedy the violation is

2  not appropriate.

3                          **I. Facts**[1]

4      This case concerns a proposed transportation project over a

5  parcel of land known as the "64 Acres," which is located in Tahoe

6  City, California, on the south shore of Lake Tahoe and the banks

7  of the Truckee River.   Pls.' Statement of Undisputed Fact

8  (hereinafter, "PSUF") ¶ 2.   Plaintiffs own condominiums that are

9  located directly south of the eastern segment of the 64 Acres

10  (Tahoe Tavern condominiums) and directly north of the eastern

11  segment (Tavern Shores condominiums).   PSUF ¶¶ 3-4.   If

12  constructed, the transportation project would include an intermodal

13  transit center that supports transit, bicycling, and walking.   2

14  AR 860.   The transit center would include space for up to six buses

15  at one time, seating/waiting areas, and 130 parking spaces.   1 AR

16  188.

17  **A. Management Prior to 1984**

18      The federal government first acquired the 64 Acres in 1904.

19  PSUF ¶ 5.   From 1904 until 1984, the U.S. Department of the

20  Interior ("USDI") Bureau of Reclamation ("BR") managed the land.

21  PSUF ¶ 6.   In 1984, BR turned over management of the 64 Acres to

22  the Truckee Carson Irrigation District ("TCID").   Federal Defs.'

23  SUF ("DSUF") ¶ 4.   USDI required that it approve any proposed

24

25 _____

26      [1] Undisputed unless otherwise noted.

1 leases of project land.[2]  DSUF ¶ 5.

2      Despite this apparent requirement, TCID began negotiating

3 leases on the 64 Acres, without first obtaining approval.  DSUF ¶

4 6.  Specifically, TCID leased the Lakeside portion of the 64 Acres,

5 which is bounded by Highway 89 on the west, to two then-new private

6 condominiums  owned  by  plaintiffs.   DSUF   ¶  7.   Under  the

7 unauthorized lease by TCID, plaintiffs claimed possession of the

8 entire Lakeside portion of the 64 Acres and restricted access by

9 members of the public, posted signs against "trespassing," and

10 illegally paved roads and lawns.  DSUF ¶¶ 8-9.  BR acknowledged,

11 however, that "[w]hile the Associations have posted the areas

12 against trespassing to maintain the right to control undesirable

13 uses, no effort [was] made to prevent public uses for picnicking

14 or bathing."  7 AR 3095.[3]

15      In the 1960s, BR and the Forest Service ("FS") began

16 discussing the possibility of transferring the site from BR to FS.

17 PSUF ¶ 8.  In 1978, BR and FS signed a Memorandum of Agreement

18 ("MOA") stating that FS "has determined that there is a public need

19 for the 64-acre tract for recreation purposes, and [BR] agrees with

20 Service's proposed use of the 64-acre tract."  PSUF ¶ 9.  The MOA

21 provided for its termination upon the transfer of the land to FS.

22 DSUF ¶ 19.  Meanwhile, though, lessees under unauthorized leases

23

24      [2] Plaintiffs dispute this statement, but the cited portion of
the record plainly indicates that USDI had such a requirement.

25

26      [3] In light of the no trespassing signs, it is difficult to
know precisely what the acknowledgment means.

3

by TCID were developing the Riverside portion of the parcel, which is bounded by Highway 89 on the east.  DSUF ¶ 14.  These developments included a restaurant converted into a liquor store and a trailer park with over 300 tenants.  DSUF ¶ 14.

In 1981, BR prepared an environmental assessment ("EA") for the proposed transfer.  PSUF ¶ 10.  That environmental assessment stated: "the Forest Service plans to develop recreation and visitor information facilities on the tract for use by the general public." PSUF ¶ 10.  Under another section, the EA also stated that "a visitor's center and transit stop are proposed."  7 AR 3081.  FS also sent a letter to BR in 1981 describing its plans for the 64 Acres.  PSUF ¶ 11.  The letter included a map, which envisioned "public transit" and "commercial area parking," with its footprint at least partially within the 64 Acres, although the parties dispute whether the locations indicated in the map mirror the currently proposed locations.  PSUF ¶ 11.

BR also prepared an environmental impact statement ("EIS") in 1983, which included a tentative development plan that envisioned "a public parking lot and bus station."[4]  7 AR 2815.  The EIS also noted that the transfer provides for "a public parking lot and bus station," DSUF ¶ 28, which were "compatible with recreation and visitor use," DSUF 98.  The EIS explained that the transfer to FS would be under the authority of the Federal Water Project Recreation Act of 1965.  PSUF ¶ 12.  That act allows BR to transfer

---

[4] Again, plaintiffs dispute whether the locations indicated in the map mirror the currently proposed locations.

1  lands to FS "for recreation and other national forest system
2  purposes."   PSUF ¶ 13.   Finally, in 1984, BR transferred
3  responsibility for management of the 64 Acres to the Secretary of
4  Agriculture under this statutory provision.  DSUF ¶ 36.

**B. Management After 1984**

Upon assuming responsibility of the 64 Acres, FS began
restoration and improvement efforts.  DSUF ¶ 37.  In 1986, FS
prepared an environmental assessment and Decision Notice/Finding
of No Significant Impact entitled, "A Plan for the Sixty-four
Acres" ("1986 plan").  DSUF ¶ 38.  This was undisputedly FS' "first
formal management plan for the site."  PSUF ¶ 22.  The 1986 plan
describes the national forest as "a source for . . . land for
numerous . . . uses that support the community."  DSUF ¶ 95.

According to the 1986 plan, FS considered transportation to
be an essential component of the recreational use of the 64 Acres:
"The crux of a successful plan will be in how it handles the
movement of people and cars through the area."   DSUF ¶ 100.
Accordingly, as with the pre-1984 documents (e.g., 1981 EA & 1983
EIS), the 1986 plan acknowledged a transit terminal on the 64
Acres.[5]  DSUF ¶ 40.  FS planned the site for both recreational and
public transit use.  DSUF ¶ 101.  The 1986 plan indicated that
regional transit improvements would complement visitor enjoyment
of recreational development such as rafting, bike trails, and a

_____

[5] Plaintiffs again point out that the transit center was
envisioned to be north of the Truckee river, rather than the
currently proposed location south of the river.

1  public beach.[6]  DSUF ¶ 101.

2      The 1986 plan also highlighted the problems associated with
3  parking, and noted that more parking -- including parking for
4  employees in the area -- could be constructed.  See 7 AR 2761 (map
5  showing plot of land marked for several purposes, including "longer
6  term parking" as well as "employee/skier shuttle to ski areas");
7  7 AR 2763 (listing "parking" as part of plan).

8      In 1988, FS prepared another EA and decision notice entitled
9  "Public Access for the Sixty-Four Acres," DSUF ¶ 42, which
10 "tier[ed] off" the 1986 plan, PSUF ¶ 26.  The 1988 EA identified
11 locations on the tract for, among other things, a 79-space parking
12 lot.  DSUF ¶ 42.  It also described a "possible" community parking
13 lot.  PSUF ¶ 29.  The EA expressed that the 64 Acres "should be
14 developed into a public recreation area consistent with the overall
15 design plan for Tahoe City."  PSUF ¶ 30.

16     Also in 1988, FS promulgated the Lake Tahoe Basin Management
17 Unit ("LTBMU") Land and Resource Management Plan.  This plan
18 identified specific uses for the 64 Acres, including facilities
19 that had been planned or developed (e.g., parking, bike trails,
20 raft launch), as well as anticipated future uses (e.g.,
21 interpretive center, transit terminal, community parking, and
22 Highway 89 realignment).[7]  DSUF ¶ 43.  The goal of the plan was to

23

24     [6] Plaintiffs dispute that the referenced regional transit
   improvements refer to a transit center on the 64 Acres.
25

26     [7] Plaintiffs note that the transit terminal was listed as a
   "potential" use.

6

1  "[p]rovide a transportation system that accesses national forest

2  resources and links well with the basinwide transportation," and

3  to reduce by 10% the vehicle miles traveled in the basin.  18 AR

4  7361.  Measures to achieve this reduction included "public

5  transportation terminal . . . centers."  Id.

6      In 1998, FS and Placer County, among others, began

7  environmental review for a transit center on the Riverside portion

8  of the 64 Acres (west of Highway 89).  PSUF ¶ 42.  The transit

9  center is slated to be on the northern part of the Riverside

10  portion of the 64 Acres.  PSUF ¶ 42.  The parties dispute whether

11  this portion would be over a meadow as opposed to forest and

12  grassland.  The transit center would provide multiple-use parking,

13  and one of those uses is projected to be by employees of businesses

14  in downtown Tahoe City, because of the shortage of parking in that

15  area.  PSUF ¶ 45.

16      In 2000, Placer County, FS, and the Tahoe Regional Planning

17  Agency published a final EIS/EIR.  PSUF ¶ 49.  The EIS/EIR stated

18  that the project would not result in any significant impacts to

19  recreational resources, PSUF ¶ 54, or to visual resources, PSUF ¶

20  55.  The EIS/EIR also did not identify any conflict between the

21  project and state or federal environmental laws, although the

22  argued conflict with the Federal Transportation Act was discussed

23  in an appended July 2000 FTA findings letter.  2 AR 942-44.

24      In October and August of 2000, respectively, FS and Placer

25  County approved the project.  PSUF ¶¶ 58-59.  Thereafter,

26  plaintiffs appealed.  PSUF ¶ 60.  FS rejected the appeal and

affirmed its record of decision, PSUF ¶ 61, whereas Placer County continued plaintiffs' appeal and elected to perform an additional environmental review.  PSUF ¶ 63.  The purpose of that review was to consider alternative locations, including off-site locations, for the project.  PSUF ¶ 64.  At a public hearing, a Placer County staff person described the original EIS/EIR as "a cursory, very general review of some sites."  PSUF ¶ 64.  The product of Placer County's additional review was a final EIR, issued September 2005, PSUF ¶ 74, that ultimately rejected the alternative locations. Placer County certified a Recirculated Final EIR in 2006.  DSUF ¶ 183.

## II. Standard

### A. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a

1  dispositive issue, a summary judgment motion may properly be made
2  in reliance solely on the 'pleadings, depositions, answers to
3  interrogatories, and admissions on file.'" Id.  Indeed, summary
4  judgment should be entered, after adequate time for discovery and
5  upon motion, against a party who fails to make a showing sufficient
6  to establish the existence of an element essential to that party's
7  case, and on which that party will bear the burden of proof at
8  trial. See id. at 322. "[A] complete failure of proof concerning
9  an essential element of the nonmoving party's case necessarily
10 renders all other facts immaterial." Id.  In such a circumstance,
11 summary judgment should be granted, "so long as whatever is before
12 the district court demonstrates that the standard for entry of
13 summary judgment, as set forth in Rule 56(c), is satisfied." Id.
14 at 323.

15     If the moving party meets its initial responsibility, the
16 burden then shifts to the opposing party to establish that a
17 genuine issue as to any material fact actually does exist.
18 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
19 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,
20 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

21     In attempting to establish the existence of this factual
22 dispute, the opposing party may not rely upon the denials of its
23 pleadings, but is required to tender evidence of specific facts in
24 the form of affidavits, and/or admissible discovery material, in
25 support of its contention that the dispute exists. Fed. R. Civ.
26 P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l

1  Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

2  1998).   The opposing party must demonstrate that the fact in

3  contention is material, i.e., a fact that might affect the outcome

4  of the suit under the governing law, Anderson v. Liberty Lobby,

5  Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of

6  Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

7  (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

8  809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is

9  genuine, i.e., the evidence is such that a reasonable jury could

10 return a verdict for the nonmoving party, Anderson, 477 U.S. 248-

11 49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200

12 F.3d 1223, 1228 (9th Cir. 1999).

13      In the endeavor to establish the existence of a factual

14 dispute, the opposing party need not establish a material issue of

15 fact conclusively in its favor. It is sufficient that "the claimed

16 factual dispute be shown to require a jury or judge to resolve the

17 parties' differing versions of the truth at trial."  First Nat'l

18 Bank, 391 U.S. at 290; see also T.W. Elec. Serv., 809 F.2d at 631.

19 Thus, the "purpose of summary judgment is to 'pierce the pleadings

20 and to assess the proof in order to see whether there is a genuine

21 need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

22 Civ. P. 56(e) advisory committee's note on 1963 amendments); see

23 also Int'l Union of Bricklayers & Allied Craftsman Local Union No.

24 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

25      In resolving the summary judgment motion, the court examines

26 the pleadings, depositions, answers to interrogatories, and

10

1  admissions on file, together with the affidavits, if any.  Rule

2  56(c); see also In re Citric Acid Litigation, 191 F.3d 1090, 1093

3  (9th Cir. 1999).  The evidence of the opposing party is to be

4  believed, see Anderson, 477 U.S. at 255, and all reasonable

5  inferences that may be drawn from the facts placed before the court

6  must be drawn in favor of the opposing party, see Matsushita, 475

7  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

8  655 (1962) (per curiam)); See also Headwaters Forest Def. v. County

9  of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).  Nevertheless,

10  inferences are not drawn out of the air, and it is the opposing

11  party's obligation to produce a factual predicate from which the

12  inference may be drawn.  See Richards v. Nielsen Freight Lines, 602

13  F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

14  (9th Cir. 1987).

15      Finally, to demonstrate a genuine issue, the opposing party

16  "must do more than simply show that there is some metaphysical

17  doubt as to the material facts. . . . Where the record taken as a

18  whole could not lead a rational trier of fact to find for the

19  nonmoving party, there is no 'genuine issue for trial.'"

20  Matsushita, 475 U.S. at 587 (citation omitted).

21  **B. Federal Law Claims**

22      Neither NEPA nor the applicable provision of the Federal

23  Transportation Act provides for an independent cause of action or

24  its own standard of review; accordingly, plaintiffs' federal law

25  claims are brought pursuant to the Administrative Procedure Act

26  ("APA").  Under the APA, "the standard of judicial review is

11

1  whether the Secretary's decision was 'arbitrary, capricious, an
2  abuse of discretion, or otherwise not in accordance with law.
3  While [agency] decisions are entitled to a presumption of
4  regularity, that presumption does not 'shield [agency] actions from
5  a thorough, probing, in-depth review.'"  Stop H-3 Assoc. v. Dole,
6  740 F.2d 1442, 1449 (9th Cir. 1984) (quoting 5 U.S.C. § 706(2)(A)
7  and Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971)).

8      Although the court must conduct a searching inquiry into the
9  facts, it may not substitute its own judgment for that of the
10 agency.  Overton Park, 401 U.S. at 416.  Generally, judicial review
11 is limited to the administrative record.  Id.  As to a NEPA claim,
12 "[w]e evaluate the EIS simply to determine whether it 'contains a
13 reasonably thorough discussion of the significant aspects of the
14 probable environmental consequences of a challenged action.'"
15 National Parks and Conservation Ass'n v. U.S. Dep't of Transp., 222
16 F.3d 677, 682  (9th Cir. 2000) (citations omitted).  If the agency
17 has taken a "hard look" at the environmental consequences, the
18 court's review is at an end.  Id.

19 **C.  State Law Claims**[8]

20

21 [8] Despite the presence of the CEQA claim, there is no bar
under Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89
22 (1984).  The claim is brought against Placer County, and counties
are not "arms of the state" for Eleventh Amendment purposes, and
they cannot claim immunity on this basis.  See Mt. Healthy City
23 Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 279 (1977) ("The
bar of the Eleventh Amendment to suit in federal courts extends to
24 States and state officials in appropriate circumstances . . . but
does not extend to counties and similar municipal corporations.");
25 Beentjies v. Placer County Air Pollution Control Dist., 397 F.3d
775, 782 n.7 (9th Cir. 2005) ("[C]ities and counties do not enjoy
26 Eleventh Amendment immunity.").

12

1    The standard of review for a CEQA claim is analogous to that
2  of the APA.   The court must determine "whether there was a
3  prejudicial  abuse  of  discretion.   Abuse  of  discretion  is
4  established if the agency has not proceeded in a manner required
5  by law or if the determination or decision is not supported by
6  substantial evidence."  Cal. Pub. Res. Code § 21168.5.  However,
7  "a reviewing court must adjust its scrutiny to the nature of the
8  alleged defect, depending on whether the claim is predominantly one
9  of improper procedure or a dispute over the facts." Vineyard Area
10 Citizens for Responsible Growth, Inc. v. City of Rancho Cordova,
11 40 Cal. 4th 412 (2007).  Thus, for example, if the claim is that
12 an agency failed to include certain information mandated by CEQA,
13 the court will apply greater scrutiny than if the claim concerns
14 whether adverse effects could have been better mitigated.   Id.

## III. Analysis

16    Pending before the court are cross-motions for summary
17 judgment.  Plaintiffs contend that they are entitled to summary
18 judgment on three claims, Section 4(f) of the Department of
19 Transportation Act, NEPA, and CEQA. As set forth below, the court
20 finds that the 64 Acres was jointly planned for both transportation
21 and recreation uses.  Accordingly, Section 4(f) does not apply.
22 In addition, the court finds that plaintiffs have established a
23 NEPA violation, but concludes that injunctive relief is not
24 appropriate.[9]

25
26    [9] The court dismisses the claims that plaintiffs have either
   abandoned or waived.  See Defs.' Reply at 16-17.

13

**A. Section 4(f) Claim**

First, plaintiffs argue that the proposed transit center violates Section 4(f) of the Department of Transportation Act. 49 U.S.C. § 303(c). That provision prohibits the Secretary of Transportation from approving of a transportation project that uses a public park unless there is no prudent and feasible alternative and the project includes all possible planning to minimize harm to the park.[10] It was enacted by Congress in response to "[t]he growing public concern about the quality of our natural environment." Overton Park, 401 U.S. at 404. Although the Federal Transit Administration makes the Section 4(f) determination, the law directs the Secretary of Transportation to "cooperate and consult" with the Secretary of Agriculture, among others. 49 U.S.C. § 303(b).

The protections afforded by Section 4(f) are subject to three exceptions. Section 4(f) does not apply if (1) both transportation and recreational uses were jointly planned (the "joint planning exception"), (2) the recreational use is only temporary (the "temporary use exception"), or (3) the property is subject to

---

[10] "[T]he Secretary may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c).

1 multiple uses and was not officially designated as Section 4(f)

2 property (the "multiple use exception"). As explained below, the

3 joint planning exception applies to the 64 Acres.[11]

### 1. Joint Planning Exception

Under the joint planning exception, Section 4(f) does not

apply to property subject to joint planning for both transportation

and recreational uses. 23 C.F.R. § 771.135(p)(5)(v)(A) (exempting

property designated "for the specific purpose of such concurrent

development by the entity with jurisdiction or ownership of the

property for both the potential transportation project and the

section 4(f) resource"). The Ninth Circuit has explained why the

law does not apply to jointly planned land use. It said that

"Section 4(f) is not meant to force upon a community, wishing to

establish a less than pristine park affected by a road, the choice

between a pristine park and a road. A community faced with this

choice might not choose to establish any park." Sierra Club v.

Department of Transportation, 948 F.2d 568, 574 (9th Cir. 1991).

A contrary rule, it argued, would create "perverse incentives,"

id., and therefore frustrate the law's goal of preserving the

natural beauty of the countryside.[12]

---

[11] Accordingly, the court need not resolve whether the multiple use exception or temporary use exception would apply.

[12] Although Sierra Club addressed the joint planning exception in the context of constructive use, rather than actual use, of land, there is no principled basis for distinguishing between the two. The joint planning exception was created to (1) ensure productive use of the land (i.e., recreation plus transportation, as opposed to only transportation) and (2) avoid the perverse incentives that make protection of recreational lands so costly

1    Here, it is plain that from the start of its planning process,

2    FS contemplated that the 64 Acres would be used for transportation

3    and recreation, not only recreation.  In its first public planning

4    document "A Plan for the 64 Acres (Oct. 1986)," 7 AR 2741 (or

5    simply, the "1986 plan"), FS stated, under a section titled

6    "Transportation and Parking," that "[t]he crux of a successful plan

7    will be in how it handles the movement of people and cars through

8    the area."  7 AR 2764.  The 1986 plan acknowledged that traffic

9    congestion and parking were serious problems, 7 AR 2746, and noted

10   various proposals that would address these problems.  7 AR 2762

11   (transit terminal); 7 AR 2757 (map showing transit center); 7 AR

12   2764 (bike paths and public transit); 7 AR 2764 (highway bypass).

13   Notably, this planning occurred prior to any recreational use on

14   the land.

15   Furthermore, documents preceding and postdating the 1986 plan

16   similarly envisioned a mix of on-site recreation and transit.  See,

17   e.g., 7 AR 2816 (BR's 1983 EIS, listing public transit as part of

18   FS' plan); 18 AR 7338 (1987 Tahoe Regional Planning Agency Plan

19   Area Statement 174 listing as permissible use transit stations and

20   terminals); 18 AR 7385 (1988 LTBMU Land and Resources Management

21   Plan, listing transit terminal and community parking as part of

22   potential site improvements); 18 AR 7348 (1994 Tahoe City Community

23   _____

24   that communities forego recreation altogether.  Furthermore,
     transportation uses, if planned in advance, would not "abruptly
25   change the community consensus about the appropriate use of the
     land," 948 F.2d at 575.  These reasons, to the extent they reflect
26   reality, apply equally to actual use as opposed to merely
     constructive use of land.

1   Plan,[13] listing transit terminal); 5 AR 1680 (1997 Lake of the Sky

2   (LOTS) map showing transit terminal and community parking site).

3   It was FS' intent that the transit center complement recreational

4   development such as bike trails, river access for rafting, a public

5   beach, and a trailhead.  7 AR 2764, 2773.

6        As FS recognized in its 2000 EIS, "development of . . . a

7   transit center and parking lot has been recommended, in whole or

8   in part, in every land use plan considered since the 1983 EIS."

9   3 AR 1072.  These references to a transit center and parking may

10  not have been exhaustive or detailed, but, as they appeared in

11  formal planning documents, at the very least they designated that

12  part of the 64 Acres be used for transit-related purposes.

13              **a. Scope of Exception**

14       Plaintiffs respond in several ways.  First, they argue that

15  the joint planning exception only applies where an agency has

16  committed itself to an "official plan" to use the land for

17  transportation.  I cannot agree.  By definition, "planning" is a

18  process: it involves the delineation of a problem, the generation

19  of potential solutions, an evaluation of those solutions, and the

20  recommendation of a course of action.  Given this reality, the

21  joint planning exception, properly understood, merely requires that

22  the    agency's    transportation    planning    be    documented

23

24       [13] Plaintiffs' evidentiary objections to this document are
    overruled.  See In re Epstein, 32 F.3d 1559 (Fed. Cir. 1994)
    (noting that administrative agencies are not bound by traditional

25  rules of evidence).  The reliance on the document also demonstrates
    the agency's reasoning process, independent of the actual contents.

26

contemporaneously with its recreation planning; it does not require FS to produce a plan with a particular level of detail or specificity.

Plaintiffs argue that an EIS that envisioned the transit center in the mid-1980s would be required in order for the joint planning exception to apply. The basis of this argument is an FTA letter, sent in response to a request by FS for guidance on the applicability of Section 4(f) to the 64 Acres. In that letter, FTA advised FS "to provide FTA with documentation that a transit center comparable to the one now being advanced has been planned at the 64 Acres . . . and that [FS] officially adopted those plans by signing . . . [an EIS]." 11 AR 4345. The letter, however, was written in the posture of giving advice -- not in the posture of legal interpretation -- and FTA's advice required more than what the law ultimately requires.[14]

Plaintiffs' interpretation of the law (i.e., demanding an EIS) would be impractical and significantly circumscribe the scope of the joint planning exception. First, "[i]t would be impractical to require all joint planning to occur before the park is actually acquired." Sierra Club v. Dep't of Transportation, 1994 WL 387860,

---

[14] The FTA letter probably does not rise to the level of an "opinion letter," given that it merely solicited more information from FS, but even if it did, it is well-settled that such letters lack the force of law and are not entitled to Chevron deference. See Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters . . . do not warrant Chevron-style deference."); Acosta v. Gonzales, 439 F.3d 550, 553 (9th Cir. 2006) (same).

1   at *4 (N.D. Cal. 1994).[15]   Here, the formal planning and

2   deliberation process involved various interested entities,

3   including the state parks, Tahoe City Public Utility District,

4   CalTrans, Tahoe Regional Planning Agency, and Placer County.

5   Requiring an EIS as a condition to the joint planning exception

6   risks upsetting the balance struck by Sierra Club.

7        Furthermore, NEPA obligates FS to evaluate a number of

8   alternatives and their environmental impacts before committing to

9   the precise scope or location of any proposed land use -- whether

10  it be for transportation or recreation use.[16]   42 U.S.C. §§ 4321 et

11  seq.; see also 40 C.F.R. § 1502.2(f) ("Agencies shall not commit

12  resources prejudicing selection of alternatives before making a

13  final decision.").   But planning in this context, as the court has

14  defined it, can occur short of an EIS.   Accordingly, plaintiffs'

15  interpretation of the law would inappropriately narrow the scope

16  of the joint planning exception.

17             **b. Contemplated versus Actual Transportation Use**

18       Next, plaintiffs maintain that the contemplated transportation

19  uses must mirror the actual transportation uses for the joint

20  planning exception to apply.   There is some support for this

21  _____

22       [15] Unless otherwise stated, the court's citations to Sierra
     Club elsewhere refer to the Ninth Circuit decision, not the
23   district court opinion.

24       [16] Although the 1983 EIS discussed the potential transit
     center, 7 AR 2816, it did not analyze the environmental
     consequences of such an action.   Thus, under plaintiffs'
25   interpretation of the law, the fact that the EIS mentioned the
     transit center would not be sufficient to invoke the joint planning
26   exception.

position.  The Section 4(f) Policy Paper states that Section 4(f) requirements "do not apply to subsequent highway construction on the reserved right-of-way as previously planned."[17] 15 AR 6538. Here, plaintiffs note that the current transportation plans do not resemble what they contend were FS' prior transportation plans, in both size (previously, a bus stop and parking lot versus now, a transit center) and location (previously, developed land north of the Truckee River versus now, undeveloped land south of the river). 7 AR 2874.

The argument is not without substance.  An agency's contemplated transportation plans must be the same in kind as those ultimately implemented.  Nonetheless, the joint planning exception is not so rigid as to prohibit any change whatsoever.  Rather, courts allow for the possibility that transportation plans will evolve over time.[18]  In Sierra Club, for instance, the Ninth Circuit found that the joint planning exception applied, even though the routing plan for a highway had changed from its original

_____

[17] The policy paper, developed by FTA's sister agency within DOT, the Federal Highway Administration ("FHWA"), provides guidance on Section 4(f) and the joint FTA/FHWA regulations implementing Section 4(f).  Although the paper refers to highway projects, its principles would appear to apply equally to transit projects.

[18] If courts were to freeze transportation plans in the exact form that they were originally conceived, there would be an incentive for overreaching (e.g., planning for a 4 acre transit center rather than a 2 acre transit center), for fear that the contents for the first planning document will control a project's fate. Alternately, the creation of recreational land itself might be discouraged in the first instance, if the joint planning exception were perceived as so rigid as to be essentially worthless.

1  conception.  948 F.2d at 570.  <u>See</u> <u>also</u> <u>Sierra Club</u>, 1994 WL 387860

2  (district court, on remand, recognizing the need for flexibility).

3  It is sensible that as the transportation demands in the region

4  grew over time, the plans for the transit center would grow as

5  well.[19]

6      Furthermore,  the  nature  and  purpose  of  the  proposed

7  transportation use remain the same.  The overarching goal of both

8  the transit center and parking lot is to get people out of their

9  cars and into public transit.  The transit center accomplishes this

10 goal by making buses more readily accessible, and by providing a

11 place where buses and riders can wait; those basic elements have

12 not changed.

13     Again, the only way to harmonize sensibly the strictures of

14 NEPA, which forbid premature commitments, with the existence of the

15 joint planning exception is to afford some degree of elasticity

16 between contemplated and actual transportation uses.  This is not

17 to say, as defendants correctly point out, that a planning agency

18 could plan a transit center but then choose to build an airport;

19 it could not.  But, here, the distinctions that plaintiffs seize

20 upon (size and location), while hardly immaterial, are not so great

21 so as to divorce the original transportation plans from its current

22

23

24     [19] The FTA wrote in a July 2000 letter: "the various elements
    of the intermodal facility are being sized in accordance with
    today's transportation needs but are not significantly different
25  from the historic plans for the transportation facilities."  2 AR
    944.  The proposed facility would occupy 2.5 acres of the 64 Acres.
26  16 AR 6656.

1   shape.[20]

2        Plaintiffs point out that the expansion of parking for the

3   transit center accommodates a new purpose: businesses in downtown

4   Tahoe City.   Specifically, FS and Placer County projected that

5   these businesses would likely require employees to park in the

6   transit center parking lot and take a shuttle to work in order to

7   free up nearby spaces.   This is no small matter.   Of the transit

8   center's 130 spaces, it is estimated that 85 would be utilized by

9   employees.   PSUF ¶ 45.

10       Even if one of the main purposes animating the transit center

11  was to accommodate transit riders accessing recreation, however,

12  there is some evidence in the record that the transit center would

13  also accommodate commercial demands.[21]   See 7 AR 2761 (map with

14  employee shuttle); 7 AR 2874 (map with commercial parking).   That

15  commercial purpose is no doubt magnified and more pronounced in the

16  _____

17       [20]  In any event, plaintiffs' portrayal of FS' original
    transportation plans is less than fully convincing.  Although there
18  is no direct guidance on this issue, it appears that the legally
    relevant time period for ascertaining FS' plans is after it
19  acquires control over the property.   See 49 U.S.C. § 303(c)
    (Section 4(f) limits application to parks of national, state, or
20  local significance "as determined by the Federal, State or local
    officials having jurisdiction over the [area]."); 15 AR 6537
21  (Section 4(f) applies to lands "identified in the management plans
    of the administering agency as being for . . . recreation . . .
22  purposes").

23       [21] To be clear, these commercial demands were accommodated to
    the extent that planning for the transit center took into account
24  the class of employee riders.  Highway expansions that use Section
    4(f) land take into account similar considerations.  See, e.g.,
25  Sierra Club v. Slater, 120 F.3d 623, 628 (6th Cir. 1997) (project
    parkway intended to facilitate commercial and industrial
26  development).

current plans, but its genesis can be found in the early planning documents.  As defendants also note, the purpose of the project is to enhance transit, not parking, with the ultimate goal of improving the quality of the lake and air.  Employees who choose alternatives to the automobile would be legitimate project users, much like destination visitors, day-use visitors, and residents. 2 AR 860.

Plaintiffs also maintain that the transfer of the 64 Acres from BR to FS never could have happened if employee parking were the intended use of the land.  Plaintiffs maintain that while BR could transfer the land to FS for "recreation and other national forest system purposes," 7 AR 2866 (reprinting Federal Water Project Recreation Act), transportation does not constitute a national forest system purpose.

Assuming, arguendo, that plaintiffs are correct, they have not alleged a reason why this is relevant to the Section 4(f) analysis. Rather, it appears that plaintiffs' argument attempts to import an external limitation on the use of forest land into Section 4(f). To the extent that plaintiffs are challenging the validity of the 1984 transfer, they have not demonstrated a jurisdictional basis for judicial review, standing to assert what appear to be the rights of BR, or that the statute of limitations on any possible claim has not already expired.[22]  In short, even if plaintiffs

_____

[22] For example, 28 U.S.C. § 2401 provides for a six-year statute of limitations, which would have already expired on the 1984 event.  Furthermore, although the court need not resolve the issue, it is not clear that transportation -- or at least some form

1   have a claim, it is the subject of a different lawsuit whose

2   viability is uncertain.

3              **c. Prior Recreational Commitments**

4        Finally, plaintiffs maintain that FS previously committed the

5   property for recreational purposes.  As evidence, they cite to a

6   1978 memorandum of understanding between FS and BR, which stated

7   that "there is a public need for the 64-acre tract for recreation

8   purposes."  1 AR 267.  Plaintiffs press that an agency cannot first

9   plan for recreational use -- as plaintiffs contend that FS did by

10  virtue of this document -- and then later qualify those plans to

11  allow transit development.

12       This is much to hang on a three-page document, memorializing

13  only the most basic points of understanding between the agencies,

14  and that terminates, by its own terms, on the date of the

15  administrative transfer of the 64 Acres to FS.   1 AR 268.

16  ───────────────────

17  of transportation -- is not a "national forest system purpose."
    Other statutes expressly provide for transportation uses on forest
18  land.  See, e.g., 43 U.S.C. § 1761(a)(6) & (7) (Federal Land Policy
    and Management Act); 16 U.S.C. § 1608(a) (National Forest
19  Management Act).
         Defendants also note that preventing automotive pollution
20  serves national forest purposes (e.g., "outdoor recreational,
    range, timber, watershed, and wildlife and fish purposes," 16
21  U.S.C. § 528) by protecting the air and water quality in the
    region.  See 2 AR 741 ("Over and over again, scientific research
22  has identified automobile emissions as one of the major
    contributors to Lake Tahoe's disturbing clarity loss."); 2 AR 851
23  ("The Intermodal Transit Center has been planned in [] large part
    to reduce Vehicle Miles Traveled."); 7 AR 2755 ("The National
24  Forests are managed principally to insure high water quality . .
    . Purely regional or local interests that don't conflict with
25  [this] can often be accommodated.").  Furthermore, one of the
    causes of congestion mentioned in the 2000 EIS/EIR stems from
26  people driving around in search of parking.  2 AR 853.

1  Moreover, the vast majority of the 64 Acres is still set for

2  recreational use.  The issue is whether the 1978 memorandum, or the

3  derivative and analogous documents cited by plaintiffs, by stating

4  the need for recreational land, implied a need for *exclusively*

5  recreational land.  There is nothing to demonstrate that they did.

6  Even if pre-transfer negotiations, documents, and statements

7  were binding on FS' plans -- which is itself unclear, see supra,

8  n.20 -- the court would examine the pre-1984 documents as a whole.

9  In addition to the 1978 memorandum, BR's 1983 Final EIS

10  unambiguously referred to the development of a "public transit

11  station" on the site.  7 AR 2816.  That document also envisioned

12  "a public parking lot and bus station."  7 AR 2815.  As this EIS

13  is more comprehensive than the 1978 memorandum, even if the court

14  were to give pre-transfer documents controlling weight, the court

15  would come to the same conclusion, that exclusive recreational use

16  was never planned.  In addition, looking at the pre-transfer

17  documents as a whole rebuts the inference that defendants somehow

18  duped BR into transferring the property for one reason and then

19  later reneged on that promise.

20  Accordingly, the court finds that the 64 Acres is not Section

21  4(f) land.  The record is replete with indications that

22  transportation was a planned use, and plaintiffs' attempts to

23  minimize the import of these references is unavailing.  As

24  defendants rightly out point, the transportation uses were no more

25  "tentative" than the recreational uses.  Thus, the court finds that

26  the land was jointly planned for both transportation and

1  recreational uses.

2  **B. NEPA & CEQA Claims**

3      Plaintiffs' second claim is that defendants violated NEPA and

4  CEQA by failing to identify adverse environmental impacts, and to

5  supplement the EIS/EIR when presented with new information, such

6  as the abandonment of the Fanny Bridge widening project, and the

7  off-site alternatives discussed in the Recirculated EIR.  The court

8  disagrees.   Plaintiffs also maintain that "the 4(f) violation

9  infected the NEPA and CEQA analyses."  Pls.' Mot. at 16.  Because

10 the court has found that the joint planning exception applies, it

11 need not address the aspects of the NEPA and CEQA claims that rely

12 upon a Section 4(f) violation.[23]

13      **1. Impacts**

14      First, plaintiffs allege that defendants failed to acknowledge

15 the transportation project's adverse impacts on the 64 Acres as

16 required under NEPA and CEQA.  42 U.S.C. § 4332(C) (directing

17 federal agencies to describe "the environmental impacts of the

18 proposed action" under NEPA); see also Cal. Pub. Res. Code §

19 21002.1(a) (directing agencies to identify "the significant effects

20 on the environment of a project" under CEQA).  The issue before the

21

22      [23] Plaintiffs point out that an agency that fails to disclose
   significant project impacts has failed to comply with CEQA's
23 procedural mandates, and that its ultimate decision must be set
   aside, even if supported by substantial evidence.  Bakersfield
24 Citizens for Local Control v. City of Bakersfield, 124 Cal. App.
   4th 1184, 1221 (2004).   While plaintiffs maintain that the
25 potential Section 4(f) violation is such an impact requiring
   disclosure (regardless of whether or not it is ultimately found to
26 exist), the court disagrees, for the reasons explained herein.

court is whether the EIS/EIR contains a reasonably thorough discussion of potential environmental effects. See Neighbors of Cuddy Mtn. v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002); Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (requiring only that the agency take a "hard look" at the issues). Here, plaintiffs maintain that neither the Forest Service nor Placer County acknowledged the significance of (1) the alleged displacement of the on-site trail loop, (2) the alleged replacement of a scenic meadow with the transit center, and (3) the threatened violation of Section 4(f).

### a. On-Site Trail Loop

The first of these issues can be dispensed with summarily. The fact that the project "displaces" a portion of an on-site trail loop does not mean that the project "replaces" the trail. Rather, the project will simply realign part of the trail -- an action that will "not preclude enjoyment of the resource." 2 AR 1192. Accordingly, the trail realignment does not result in any significant recreational impacts.[24]

### b. Meadow

The second of these issues merits further discussion. Plaintiffs contend that the transit center would displace an open meadow based on two documents. First, the 2000 EIS/EIR refers to

---

[24] In their reply, plaintiffs recant their earlier misstatement that the loop trail segment to be realigned is used by 270 people per hour. Pls.' Reply at 7. That statistic refers to the entire regional trail network, rather than the on-site trail.

"the open meadow on the north side of the 64-Acre Tract" over which the proposed project would lie. 3 AR 1197. Defendants maintain that this statement was inaccurate because the source cited for that proposition in the EIS (TRPA's 1993 Lake Tahoe Scenic Resources Evaluation) in fact indicated that the meadow was on the *south* side of the 64-Acre Tract. That source places the meadow in "Segment 3" and "across from Tahoe Tavern." It appears to the court that the only piece of land satisfying both these requirements is, as defendants point out, in the southern part of the land. This would suggest that the transit center will not be built on the meadow in the southern region.

However, the second document -- aerial photographs of the 64 Acres from 1995 and 2005, 18 AR 7388 -- is troubling. The area that defendants maintain is an open meadow appears to contain closely spaced trees, but the land where the transit center would be located is described as "a flat area with widely spaced mature conifer trees." 3 AR 1197. Regardless of whether or not a meadow exists in the southern region, as defendants maintain is the case, it appears that a meadow (possibly a second meadow) might also exist in the land over which the project would be built.

Ultimately, though, the court need not resolve this factual dispute definitively, because it is not material to whether defendants are entitled to judgment as a matter of law.[25]   NEPA

---

[25] If the dispute were material, the issue of whether land is a meadow versus a forest is the type of factual question over which, in the absence of clear evidence, the court would likely defer to Forest Service's expertise.

1   requires no more documentation than an EIS that sets forth the

2   pertinent facts for the decision-maker to weigh.  See Robertson v.

3   Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) ("If the

4   adverse environmental effects of the proposed action are adequately

5   identified and evaluated, the agency is not constrained by NEPA

6   from deciding that other values outweigh the environmental

7   costs.").

8        Here, the EIS/EIR discussed the conversion of 2.5 acres of

9   open space by land coverage.  2 AR 929, 1155.  One of the comments

10  also addressed the loss of "open space, with a lovely mixture of

11  trees and meadows."  2 AR 843.  The Response to Comments expressly

12  noted the open space in the location of the transit center and

13  parking lot would be lost, but also observed that the remaining

14  portions of the 64 Acres, which facilitate dispersed recreational

15  opportunities, would remain in their currently restored state until

16  other planned developments occurred.  Id.  The EIS/EIR concluded

17  that the transit center "is designed to give the public greater

18  access to [recreational] amenities with minimal loss of open

19  space."  Id.  These actions satisfy the required "hard look" that

20  agencies must take.

21       Furthermore, the EIS discussed the visual impacts of the new

22  transit building, 3 AR 1203-04, and the visual impacts of the

23  parking lot, 3 AR 1204-05.  These potential impacts were determined

24  to be significant, but not once mitigation measures (e.g., avoiding

25  unnecessary tree removal, landscape screening, etc.) were in place.

26  Accordingly, the court finds that the EIS/EIR adequately addressed

1    the environmental impacts caused by a loss of open space.

2    **c. 40 C.F.R. § 1508.27**

3    Third, plaintiffs argue that defendants violated NEPA by
4    failing to address a threatened Section 4(f) violation in the EIS.
5    Under 40 C.F.R. § 1502.1, EISs should "provide full and fair
6    discussion of significant environmental impacts." Plaintiffs point
7    out that 40 C.F.R. § 1508.27 further defines "significantly" as
8    including "[w]hether the action threatens a violation of Federal,
9    State, or local law or requirements imposed for the protection of
10   the environment." Accordingly, plaintiffs argue that because there
11   was a potential Section 4(f) violation, defendants were obligated
12   to discuss it in the EIS, which they allegedly did not do.

13   As an initial matter, defendants have identified various
14   environmental and decisional records in which the threat of a
15   Section 4(f) violation was disclosed. See, e.g., 2 AR 942-44 (July
16   2000 FTA findings letter in FS August 2000 Transit EIS); 11 AR
17   4309-10 (July 2000 FTA findings letter); 1 AR 204-206 (FS' October
18   2000 Transit ROD); 1 AR 170-71 (FTA's August 2001 ROD). Plaintiffs
19   fail to respond to these cited portions of the record. In
20   addition, the portions of the EIS that discuss the planned
21   transportation uses of the 64 Acres also rebut the potential
22   Section 4(f) violation, even if not expressly.

23   In any event, even if defendants were under an obligation to
24   disclose the Section 4(f) issue as significant in the EIS, any
25   failure to do so would, in light of the court's foregoing analysis,
26   be moot.

1      **2. Alternatives**

2      Second, plaintiffs maintain that defendants failed to engage

3 in a sufficient alternatives analysis.  The alternatives analysis

4 allows both decision-makers and the public to determine whether

5 there are better ways of accomplishing a project's goals.   40

6 C.F.R. § 1502.14 (regulatory section on alternatives which has been

7 described as "the heart of the environmental impact statement");

8 14 Cal. Code Regs. § 15126.6.  See also Kings County Farm Bureau

9 v. City of Hanford, 221 Cal. App. 3d 692, 733 (1990) (noting that

10 an EIS/EIR "which does not produce adequate information regarding

11 alternatives cannot . . . enable the reviewing agency to make an

12 informed decision and to make the [] reasoning accessible to the

13 public.").

14      The range of alternatives that must be analyzed is determined

15 by the project's purpose and need.  See Vt. Yankee Nuclear Power

16 Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519 (1978);

17 Northwest Environmental Def. Ctr. v. Bonneville Power Admin., 117

18 F.3d 1520, 1538 (9th Cir. 1997).  An agency, however, need not

19 consider alternatives that are unfeasible, ineffective, or

20 inconsistent with the policy objectives for the management of the

21 area.   Headwaters, Inc. v. U.S. Bureau of Land Mgmt., 914 F.2d

22 1174, 1180 (9th Cir. 1990).

23      Here, the EIS/EIR examined three alternatives, a proposed

24 action, an alternative site design, and a no action alternative.

25 3 AR 1061-62.  While it may be true that there are circumstances

26 under which three alternatives will satisfy defendants' NEPA

obligations, <u>see</u>, <u>e.g.</u>, <u>Laguna Greenbelt, Inc. v. U.S. Dep't of</u> <u>Transp.</u>, 42 F.3d 517, 524 (9th Cir. 1994), here, it appears fairly certain that the original EIR/EIR's analysis of alternatives was, as a Placer County staff person described them, "a cursory, very general review of some sites."[26]   PSUF ¶ 64.

Plaintiffs contend that Placer County's analysis of additional off-site alternatives proves that the federal defendants' alternatives analysis was insufficient.[27]   NEPA is, of course, essentially a procedural statute.   Thus, the question is whether the initial failure to consider more off-site alternatives so undermines the process as to require that FS undertake a new evaluation.   For the reasons set forth below, the court concludes that it does not.

The critical point appears to be that Placer County's analysis came to the same conclusion as the original 2000 EIS/EIR, and the

_____

[26] In contrast, Placer County clearly satisfied its obligation to analyze alternatives under CEQA when it studied 13 alternatives in the Recirculated EIR.   1 AR 421-31, 513-59.

[27] The federal defendants eliminated seven alternative proposals from detailed analysis.   These included (1) removing the LOTS project, (2) moving the transit center and parking lot to a different location on the 64 Acres, (3) developing a new access road to the transit center from the north, (4) waiting until Highway 89 was realigned, (5) constructing overhead or underground crossings to reduce pedestrian crossings of Highway 89, (6) moving the project off the 64 Acres, and (7) locating the parking lot outside the Lake Tahoe Basin and eliminating the transit center. The federal defendants maintain that many would not satisfy the purpose of the project, would not be accomplishable in a reasonable period of time, or would not be technologically feasible.   3 AR 1055-61.   The off-site locations that plaintiffs argue should have been considered also allegedly possessed problems of parcel assembly and razing.   3 AR 1059; 1 AR 524-25.

1   federal defendants appear to be entitled to rely on this analysis.

2   See 1 AR 360 ("staff from the USFS determined that the original EIS

3   would not require further recirculation with the Draft Recirculated

4   EIR"); 8 AR 3114 (acknowledging Recirculated EIR and finding that

5   "the 2000 Transit Center ROD is consistent with County plans");

6   Sylvester v. U.S. Army Corps of Eng'rs, 884 F.2d 395, 401 (9th Cir.

7   1989) ("ordinary   notions   of   efficiency   suggest   a   federal

8   environmental review should not duplicate competently performed

9   state environmental analysis"); Wetlands Action Network v. U.S.

10  Army Corps of Eng'rs, 222 F.3d 1105, 1117 (9th Cir. 2000) (noting

11  that a project had already been subject to extensive state

12  environmental review).  The Recirculated EIR thus satisfies the

13  required "hard look" that the agencies take.

14      Plaintiffs respond that an agency (i.e., FS) cannot wait to

15  explain its decisions until litigation commences and then

16  supplement the record with post hoc rationalizations.  See Overton

17  Park,   401   U.S.   at   419   (finding   litigation   affidavits

18  impermissible); Friends of Clearwater v. Dombeck, 222 F.3d 552, 558

19  (9th Cir. 2000).[28]

20      To the extent that FS had any duty to supplement in light of

21

22      [28] In Friends of Clearwater, the Ninth Circuit found that FS
    violated its duty to supplement where "[t]here [was] no evidence
23  in the record that, before the inception of this action, the Forest
    service   ever   considered   whether"   the   new   information   was
24  sufficiently significant to require a supplemental EIS.  Friends
    of Clearwater, 222 F.3d at 558.  Here, however, the record reveals
25  that FS decided in 2005 that the EIS did not need to be
    recirculated because of Placer County's Recirculated EIR.  1 AR
26  360.

1   Placer County's Recirculated EIR, the documents produced by FS

2   after the commencement of litigation, 8 AR 3112-16, 18 AR 7401-06,

3   are nevertheless appropriately before the court.  It has been held

4   that where plaintiffs seek to compel an agency to prepare a

5   supplemental EIS, "review is not limited to the record as it

6   existed at any single point in time, because there is no final

7   agency action to demarcate the limits of the record."  Id. at 560.

8   Accordingly, an injunction against agency action is said to be

9   inappropriate where the agency has "rectified a NEPA violation."

10  Id.

11      To the extent that FS was independently obligated to analyze

12  more alternatives -- even without the prompting of Placer County's

13  subsequent analysis -- it would make no sense to require an agency

14  to prepare a Recirculated EIS, when, in effect, the violation has

15  been remedied.  "Federal courts are not obligated to grant an

16  injunction for every violation of the law."  National Wildlife

17  Federation v. Burlington Northern R.R., Inc., 23 F.3d 1508, 1511

18  (9th Cir. 1994).  Although "absent unusual circumstances, an

19  injunction is the appropriate remedy for a violation of NEPA's

20  procedural requirements," Forest Conservation Council v. U.S.

21  Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995) (internal

22  quotation marks omitted), the court must examine the totality of

23  the circumstances in deciding whether to issue an injunction based

24  on its equitable powers.  Here, although the court concludes that

25  analysis of more alternatives was appropriate, no injunction is

26  warranted in light of Placer County's Recirculated EIR.

1  **3.  Supplementation**

2       Third, plaintiffs claim that the federal defendants violated

3  NEPA by failing to supplement the 2000 EIS/EIR in light of the

4  abandonment of the Fanny Bridge widening.  An agency has "a

5  continuing duty to gather and evaluate new information relevant to

6  the environmental impact of its actions."  <u>Warm Springs Dam Task</u>

7  <u>Force v. Gribble</u>, 621 F.2d 1017, 1023 (9th Cir. 1980).  "When new

8  information comes to light the agency must consider it, evaluate

9  it, and make a reasoned determination whether it is of such

10 significance as to require an SEIS."  <u>Friends of Clearwater v.</u>

11 <u>Dombeck</u>, 222 F.3d 552, 558 (9th Cir. 2000) (quoting <u>Warm Springs</u>

12 <u>Dam Task Force</u>, 621 F.2d at 1024).  However, "[a] supplemental EA

13 is not required in response to every design change."  <u>Price Road</u>

14 <u>Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.</u>, 113 F.3d 1505,

15 1512 (9th Cir. 1997).

16      In August 2006, FS prepared a Supplemental Information Report

17 ("SIR").  In it, FS detailed the findings of the Recirculated EIR,

18 8 AR 3113-14, and noted that the widening of Fanny Bridge was still

19 10 years away from implementation, 8 AR 3115.  The SIR did not find

20 that a supplemental EIS was required in light of this information.

21 Additionally, in December 2006, a supplement to the SIR was

22 prepared.  18 AR 7401-06.  The supplement explained in greater

23 detail FS' conclusion that the County's proposed mitigation

24 measures in place of the Fanny Bridge widening did not constitute

25 new information.

26      The abandonment of the Fanny Bridge widening project does not

constitute significant new information, because other mitigation
measures were adopted in its place.  These other measures included
contributing to a Highway 89 crossing guard program and providing
enhanced summer transit services; indeed, these were deemed more
appropriate for the scale of the transit project.  1 AR 464-65,
481-82.  Although Fanny Bridge would not be widened, the
Recirculated EIR concluded that there would less-than-significant
impacts because of the replacement mitigation measures.

In light of Placer County's analysis, the federal defendants
were not obligated to supplement its own report.  See Sylvester,
884 F.2d at 401; Wetlands Action Network, 222 F.3d at 1117. FS was
only obligated to supplement if there remained major federal action
to occur, and "the new information [was] sufficient to show that
the remaining action will affect the quality of the human
environment in a significant manner or to a significant extent not
already considered."  Marsh v. ONRC, 490 U.S. 360, 374 (1989).
Here, the Recirculated EIS was already considered by FS.  1 AR 360.

Nevertheless, assuming, arguendo, that the federal defendants
were obligated to assess whether a supplemental EIS was warranted
in light of the abandonment of the Fanny Bridge widening project,
they satisfied this obligation with the December 2006 supplement.[29]
18 AR 7401-06; see Idaho Sporting Cong., Inc. v. Alexander, 222
F.3d 562, 565-66 (9th Cir. 2000) (approving of SIR to determine

---

[29] As noted above, this document is appropriately before the
court even though it was prepared after FS' record of decision and
the commencement of litigation.

whether a supplemental EA or EIS was necessary); <u>Marsh</u>, 490 U.S. at 378.   That document explains the reasons why the County's proposed mitigation measures are consistent with the original transit center decision and do not constitute significant new information warranting supplementation of the EIS.[30]  18 AR 7401-06.

To summarize, the court finds that defendants adequately satisfied their obligations under NEPA and CEQA to give the required "hard look" at the impacts of the proposed action. Furthermore, while the original EIS/EIR should have considered additional alternatives, no injunction would be appropriate in light of Placer County's subsequent, competently performed analysis.  Finally, the court finds that any duty to supplement in light of the abandonment of the Fanny Bridge widening project was discharged.

### IV. Conclusion

In light of the foregoing, the court orders as follows:

1.   Plaintiffs' motion for summary judgment is DENIED.

2.   Defendant Forest Service and Federal Transit

---

[30] The 2000 EIS originally concluded that the project would create an additional 16 vehicles crossing Fanny Bridge during peak-hour traffic.  18 AR 7401.  With the widening of Fanny Bridge, the potential impact was determined not to be significant.  18 AR 7402. Based on more current information, however, the December 2006 supplement found that the unmitigated impacts for the project were less than previously contemplated, with a total of 5 additional vehicles each hour. 18 AR 7403. Furthermore, the supplement found that because the proposed mitigation measures would reduce the impact to below no-project levels, there was no new significant information triggering a duty to revise the EIS.

1         Administration's motion for summary judgment is

2         GRANTED, except as noted.

3     3.  Defendant Placer County's motion for summary judgment

4         is GRANTED.

5     4.  No injunction shall issue.

6   IT IS SO ORDERED.

7   DATED:  April 30, 2007.

8

9

10  LAWRENCE K. KARLTON
    SENIOR JUDGE

11  UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26